**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Ruben Aaron Rivera Jurado,

Plaintiff,

v.

Roxana Perez Marin,

Defendant.

No. CV-26-02851-PHX-KML

**ORDER**

Petitioner Rubén Aaron Rivera Jurado filed this petition for the return of his minor child, C.X.R.P., whom he alleges was brought to Arizona from Mexico by the child's mother, respondent Roxana Pérez Marín. (Doc. 1.) Because Rivera Jurado has established by a preponderance of the evidence that Pérez Marín wrongfully retained C.X.R.P. and Pérez Marín has not established that an exception warrants denying Rivera Jurado's petition,[1] the petition is granted.

## I. Findings of Fact

Rivera Jurado (a citizen and resident of Mexico) and Pérez Marín (a citizen of Mexico and resident of Arizona) met in 2016 and formed an intimate relationship. (Doc. 13 at 7.) Together they share legal custody of their daughter C.X.R.P., who is eight years old. C.X.R.P. resided in Juárez, Chihuahua, Mexico for her entire life until the events

[1] Pérez Marín initially failed to file a response to Rivera Jurado's opening brief. The court granted her additional time to respond (Doc. 25), which she did not do until after the deadline (Doc. 27). Pérez Marín's response largely repeats her answer and previously-submitted evidence, so it does not meaningfully alter the court's analysis or disposition. The court therefore considers it here even though it is untimely.

giving rise to this petition. (Docs. 1 at 3; 13 at 6, 14.)

Pérez Marín claims she ended her relationship with Rivera Jurado in 2023 because she felt it "no longer provided a healthy environment for herself or her daughter." (Doc. 13 at 7.) At some point afterwards, Rivera Jurado filed for custody of C.X.R.P., allegedly because Pérez Marín was "living with a partner who did drugs, abused alcohol, and committed domestic violence against [her]." (Doc. 1 at 3.) Rivera Jurado and Pérez Marín eventually entered into a custody and child-support agreement for C.X.R.P. in April 2025, which was adopted and entered as an order by a family court in Juárez (the "Mexico order"). (Doc. 26; *see* Doc. 1 at 3–4.) The Mexico order awarded physical custody and guardianship of C.X.R.P. to Rivera Jurado and weekend visitation rights to Pérez Marín, with both parties to alternate holiday and vacation time. (Doc. 26 at 19.) The order also prohibited the parties from changing C.X.R.P.'s habitual place of residence—which the Mexican court determined was in Juárez—but otherwise permitted them to travel with C.X.R.P. outside the city, subject to several limitations. Relevant here, any travel which interfered with C.X.R.P.'s schooling was not permitted. (Doc. 26 at 21.)

Pérez Marín later became a lawful permanent resident of the United States and established residence in Arizona. (Doc. 13 at 7.) With Rivera Jurado's consent, Pérez Marín brought C.X.R.P. to Arizona in summer 2025, which Rivera Jurado alleges was only for a temporary vacation meant to end in September 2025.[2] (Docs. 1 at 4; 13 at 6.) But Rivera Jurado claims that in August, Pérez Marín "cut off communication" between him and C.X.R.P., enrolled C.X.R.P. in school in Arizona, and has retained C.X.R.P. here ever since. (Doc. 1 at 4.) As a result, Rivera Jurado filed this petition in April 2026 under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 [hereinafter "Hague Convention" or "Convention"], arguing Pérez Marín's continued retention of C.X.R.P. is wrongful. (Doc. 1 at 4–5, 14.)

Pérez Marín does not dispute these background facts but argues her retention of

[2] Rivera Jurado alleges Pérez Marín first brought C.X.R.P. to Arizona in June (Doc. 1 at 4), while Pérez Marín alleges it was August (Doc. 13 at 6). The precise date ultimately has no bearing on the outcome of this case.

C.X.R.P. is not wrongful because it is out of concern for C.X.R.P's welfare and safety. (*See* Docs. 8; 27.) Specifically, she claims she experienced domestic violence during her relationship with Rivera Jurado and believes C.X.R.P. "could be harmed" if returned to Rivera Jurado's care. (Doc. 27 at 1.) Among other evidence, she submits an Arizona order of protection she received restricting Rivera Jurado from contacting or approaching either her or C.X.R.P. (Doc. 13 at 10–11.) She also expresses concern about the "psychological impact that separation from her mother could have" on C.X.R.P. if returned to Mexico. (Doc. 27 at 3.)

## II. Legal Standard

The United States has implemented the Hague Convention's provisions through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9000, *et seq*. A court reviewing a petition for return under the Convention "may not resolve the question of who, as between the parents, is best suited to have custody of the child." *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). Instead, the court's role is limited to determining "whether the removal or retention of a child was wrongful under the law of the child's habitual residence." *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999) (simplified). If it was, then a court which receives a petition within one year of said wrongful removal or retention must order the child's "prompt return" to her place of habitual residence "unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014) (citing Hague Convention art. 12).

Under the ICARA, the petitioner bears the initial burden of showing by a preponderance of the evidence that the child is under the age of sixteen, the child's country of habitual residence is a party to the Convention, and removal or retention was wrongful so as to trigger the Convention's obligations. 22 U.S.C. § 9003(e)(1)(A); *see* Hague Convention art. 4. Only after such a showing does the burden shift to the respondent to demonstrate the applicability of any exceptions. *Id.* § 9003(e)(2).

## III. Analysis

As an initial matter, Rivera Jurado has established that C.X.R.P. is eight years old,

which is well below the Hague Convention's age cutoff of sixteen. Rivera Jurado has also supplied a certified copy of the Mexico order, which establishes that C.X.R.P.'s place of habitual residence is Juárez, Mexico. Mexico is a party to the Convention, as Rivera Jurado notes in his petition (Doc. 1 at 5). *See* Hague Conference on Private International Law, *Convention of 25 October 1980 on the Civil Aspects of International Child Abduction: Status Table* (last updated Nov. 14, 2022), https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (listing 1991 as the year of Mexico's accession and entry into force). And because Rivera Jurado filed this petition approximately seven months after he alleges C.X.R.P. was retained, he is presumptively entitled to an expeditious return remedy under Article 12 of the Convention if he can establish the retention was in fact wrongful. *See Lozano*, 572 U.S. at 5.

### A. Wrongful Retention

Under the Convention, a retention is wrongful where (1) it is in breach of the rights of custody under the law of the country of habitual residence and (2) those rights were actually being exercised (or would have been exercised but for the retention). Hague Convention art. 3. Courts applying this provision must answer four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001), *abrogated on other grounds by Monasky v. Taglieri*, 589 U.S. 68 (2020).

#### 1. Date of Retention

As to the first element, Rivera Jurado alleges that retention "began in or about September 2025, when [Pérez Marín's] authority to keep the child in the United States ended and she refused to return her." (Doc. 19 at 5.) Because Pérez Marín does not dispute this timeline, the court adopts it.

**2. Habitual Residence**

Turning to the second element, Rivera Jurado asserts that Juárez, Mexico is C.X.R.P.'s place of habitual residence and was so immediately before her retention began. (Doc. 20 at 2.) Though Pérez Marín does not appear to contest this point, the court explains briefly why any attempt to do so would fail.

Habitual residence refers to the place where a child "has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Nisbet v. Bridger*, 124 F.4th 577, 584 (9th Cir. 2024) (simplified). In other words, it is where a child is "at home" at the time of retention. *Monasky*, 589 U.S. at 71, 77. Because this is a fact-driven inquiry, "courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78. The present case is straightforward.

The Mexico order established Juárez as C.X.R.P.'s place of habitual residence. To be clear, neither a foreign court order nor an agreement between the parties as to habitual residence is dispositive in the Ninth Circuit. *See id.* at 76 ("[T]he determination of habitual residence does not turn on the existence of an actual agreement."); *cf. Holder v. Holder*, 305 F.3d 854, 864 (9th Cir. 2002) ("[F]ederal courts adjudicating Hague Convention petitions must accord full faith and credit only to the judgments of those state or federal courts that actually adjudicated a Hague Convention claim in accordance with the dictates of the Convention."). But it is typically the case that "[w]here a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Monasky*, 589 U.S. at 78.

Here, C.X.R.P. resided in Juárez for her entire life until she went to visit her mother in Arizona in 2025. That visit was understood by Rivera Jurado to be temporary and was in fact *required* to be temporary under the Mexico order. The order expressly prohibited either party from traveling with C.X.R.P. in ways which would interfere with her schooling in Juárez and from changing C.X.R.P.'s habitual residence. Pérez Marín knew her obligations under the agreement and by her own account "entered into [it] in good faith,"

yet kept C.X.R.P. in Arizona in violation of its terms anyway.[3] (Doc. 8 at 1.)

It is true that in some cases, considering a child's "acclimatization" to a new location is appropriate when determining their habitual residency. *See Nisbet*, 124 F.4th at 584 (quoting *Monasky*, 589 U.S. at 78 n.3) (acclimatization is more relevant in cases concerning older children and involves weighing, *inter alia*, "geography combined with the passage of an appreciable period of time," "academic activities," and "meaningful connections with the people and places"). But this is not such a case. When C.X.R.P.'s retention began in September 2025, she had been living in Arizona for only a few months—a short period of time relative to the eight years she spent in Juárez. Most of that time was also during the summer, when C.X.R.P. was presumably not enrolled in an Arizona school and had not yet formed significant academic or community ties. And although Pérez Marín shares a "close emotional bond" with C.X.R.P. (Doc. 27 at 3), that bare fact does not outweigh the reality that Pérez Marín had no authority to permanently keep C.X.R.P. in Arizona away from her father without his consent and in violation of the parties' mutually agreed-upon custody arrangement. A common-sense assessment of the totality of the circumstances here shows that C.X.R.P. was habitually resident in Juárez immediately prior to the retention. Her presence in Arizona does not change that fact.

### 3. Breach of Rights of Custody Under Mexican Law

Regarding the third element, "retention is wrongful if done in violation of the custody laws of the child's habitual residence." *Monasky*, 589 U.S. at 72. Under the Hague Convention, rights of custody include those relating to the care of the child as well as the "right to determine the child's place of residence." Hague Convention art. 5. Such rights may arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention art. 3.

Here, Rivera Jurado points to the Mexico order as conferring upon him "a right to

[3] Pérez Marín later alleges in her response that she signed the agreement under pressure. (Doc. 27 at 3.) Even if this undermined the validity of the parties' agreement as adopted into the Mexico order, the court need not rely on the order's validity because other evidence sufficiently establishes that C.X.R.P.'s habitual residence is indeed Juárez.

determine where [C.X.R.P.] lives and to withhold consent to her relocation abroad." (Doc. 19 at 6.) Pérez Marín does not dispute this, and in any event it is clear her retention of C.X.R.P. did violate the rights awarded to Rivera Jurado. Specifically, Pérez Marín's retention of C.X.R.P. in Arizona deprived Rivera Jurado of his rights to primary custody and to access his own daughter—especially when considered in light of the protective order Pérez Marín received against him. It also deprived Rivera Jurado of his right as C.X.R.P.'s guardian to have a say in where she could and could not reside. Accordingly, Rivera Jurado has satisfied this element.

**4. Rivera Jurado's Exercise of His Rights**

As for the final element, Rivera Jurado must demonstrate he was either exercising his parental rights at the time of retention or would have exercised them but for the retention. Hague Convention art. 3(b). A petitioner's burden as to this element is "minimal," because imposing a high burden would "contradict[] the Convention's objective to reserve custody determinations for the country of habitual residence." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009); *see In re ICJ*, 13 F.4th 753, 762 (9th Cir. 2021) ("[F]ederal circuit courts in the United States have consistently required a showing that a parent has clearly and unequivocally abandoned a child before ruling that that parent is *not* actually exercising his custody rights.")

Here, Pérez Marín does not contest Rivera Jurado's claims that he maintained care and custody over C.X.R.P. until June 2025 (when she first went to Arizona), exercised his right as her guardian by consenting to a temporary visit to Arizona, and sought her return once he suspected wrongful retention. (Doc. 19 at 6.) On these uncontested facts, Rivera Jurado has met his minimal burden of showing he was exercising his parental rights when the retention began in September 2025 and would have continued exercising those rights had Pérez Marín rightfully returned C.X.R.P. to his care at that time.

**B. Hague Convention Exceptions**

Because Rivera Jurado has established a prima facie case of wrongful retention, the burden shifts to Pérez Marín to demonstrate that one of the Convention's exceptions applies

and warrants denying Rivera Jurado's petition for return. Pérez Marín raises only the exception set forth in Article 13(b) (Doc. 27 at 4), which provides that return is not required if there is a "grave risk" that it "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Under the ICARA, a petitioner must prove the applicability of the grave-risk exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

The grave-risk exception is "narrowly drawn, so as not to impair the Convention's general policy" of effecting the prompt return of abducted children. *Colchester v. Lazaro*, 16 F.4th 712, 718 (9th Cir. 2021) (simplified). The proper inquiry is not "where the child would be happiest," but "whether the child would suffer serious abuse that is a great deal more than minimal." *Gaudin v. Remis*, 415 F.3d 1028, 1035–36 (9th Cir. 2005), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022) (simplified). For instance, a grave risk of harm may exist "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the child[] in question. [Intimate partner] violence may also establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Colchester*, 16 F.4th at 717–18 (citing *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014); *Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (11th Cir. 2016); *Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012); *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000)).

Pérez Marín's evidence includes claims that Rivera Jurado insulted and manipulated her (Doc. 13 at 6, 12–13) and copies of text messages where he threatened to pursue legal action and to prevent her from seeing C.X.R.P. (Doc. 13 at 31, 35, 37, 39; *see* Docs. 13 at 12–13, 27 at 2–3). She also submits evidence of prior claims that Rivera Jurado was violent towards her in C.X.R.P.'s presence (Doc. 13 at 12–13) along with a video transcript and declaration in which C.X.R.P. describes witnessing Rivera Jurado brandish a knife that he "wanted to throw" at Pérez Marín (Doc. 13 at 40–42).[4] Additionally, she submits copies of her petition for a protective order against Rivera Jurado as well as the order itself.[5] (Doc.

---

[4] Pérez Marín provides three declarations, including her own. (Doc. 13 at 6, 42, 43.) Although all are missing elements necessary to have legal force and effect under 28 U.S.C. § 1746, for purposes here the court assumes their truth.

[5] Pérez Marín also presents evidence that Rivera Jurado once allegedly gave C.X.R.P. a

13 at 10–11.) Even assuming Rivera Jurado behaved exactly as Pérez Marín alleges, she has not established that C.X.R.P. would be exposed to a grave risk of physical or psychological harm or an intolerable situation if returned to Mexico.

To begin, nowhere does Pérez Marín contend that Rivera Jurado ever "actually abused, threatened to abuse, or inspired fear in" C.X.R.P. *Colchester*, 16 F.4th at 717–18. She submits a declaration from a relative stating C.X.R.P. "often appeared hesitant to express herself freely in matters involving her father" and another stating C.X.R.P. "seemed more comfortable and more willing to express herself when she was with her maternal family." (Doc. 13 at 42–43.) Construed generously, these statements at most imply that C.X.R.P. is happier living with her mother; they do not show Rivera Jurado "inspired fear in" C.X.R.P. *Id.* The grave-risk exception does not permit the court to "speculate on where the child would be happiest." *Gaudin*, 415 F.3d at 1035. And Pérez Marín does not provide evidence or argument supporting that Rivera Jurado's behavior means C.X.R.P. objects to her own return. *See* Hague Convention. art. 13 (a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views").

Relatedly, Pérez Marín's concern that separating C.X.R.P. from her mother would cause her psychological harm (Doc. 27 at 3) also fails to satisfy the standard for grave risk. *See Aguilera v. De Lara*, No. CV14-1209-PHX-DGC, 2014 WL 3427548, at *5 (D. Ariz. July 15, 2014) ("[C]ourts have held that separation of a parent and child, although traumatic, is not itself sufficient to satisfy a grave risk exception.") (citing cases); *cf. Asvesta v. Petroutsas*, 580 F.3d 1000, 1020–21 (9th Cir. 2009) (traumatic effect of separating child and parent goes to the best interests of the child, which is an issue reserved to courts of the child's habitual residence).

Most importantly, the Convention makes clear the risk of harm must be to the *child*

---

beer. (Doc. 13 at 13, 40–41.) Even if true, such an act goes not to grave risk but to Rivera Jurado's fitness as a parent, which is a matter more appropriately reserved for a family court in the country of habitual residence. *See Cuellar*, 596 F.3d at 508.

for the grave-risk exception to apply. *See* Hague Convention art. 13(b). Although evidence of domestic abuse by one parent against the other may establish a grave risk of harm, cases applying the grave-risk exception on these grounds are generally limited to two categories. Ultimately, neither apply here.

First are cases in which abuse was previously directed toward both the parent and child, such that a grave risk of further harm to the child can reasonably be inferred. *See, e.g.*, *Ermini*, 758 F.3d at 164 ("[Father's] history of domestic violence towards [mother] *and the children* was itself sufficient to establish the Hague Convention's 'grave risk' of harm defense.") (emphasis added); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (evidence of father's extensive physical and verbal abuse of mother, physical abuse of daughter, and threat to kill their children was sufficient to establish grave-risk exception). But such cases do not help Pérez Marín, because as explained, her allegations and evidence demonstrate Rivera Jurado's conduct was directed towards *her*, not C.X.R.P.

The second category of cases concerns situations where—as here—past abuse was only directed towards individuals other than the child (typically, the other parent). In these situations, abuse of others may nevertheless create a grave risk of future harm to the child if it is "sufficiently serious," *Gomez*, 812 F.3d at 1010, and "sustained" enough to establish a "pattern" and "propensity" for abuse. *Ermini*, 758 F.3d at 164. But "limited incidents"—even if witnessed by the child—do not tend to establish grave risk. *Ermini*, 758 F.3d at 165. *See, e.g.*, *Kelly & Turner*, No. 3:25-CV-247-SI, 2025 WL 1202043, at *18–21 (D. Or. Apr. 25, 2025), *aff'd sub nom. Kelly v. Turner*, No. 25-3638, 2026 WL 1230531 (9th Cir. May 5, 2026) (grave-risk exception applied where father had "generalized pattern of violence," "history of spousal abuse," "repeated disobedience of court orders," "inability to control his temper," threatened to kill mother, and had "violent temper directed at [mother] while holding [child] evidencing a complete disregard for [child's] safety," which suggested he would behave similarly towards child if returned to his care); *Gomez*, 812 F.3d at 1007–15 (mother's "pattern of threats and violence" against father and his family—including vandalism, death threats, and shooting father's girlfriend where child had been

sitting only minutes earlier—was "sufficiently serious" to create grave risk that child would be physically or psychologically harmed by virtue of being "raised in an environment where one parent is engaged in a sustained campaign of violence").

Pérez Marín's evidence regarding Rivera Jurado's conduct falls far short of demonstrating the kind of severe and persistent abuse necessary for the grave-risk exception to apply. His threats to pursue legal action or to otherwise enforce the terms of the Mexico order are not akin to the violent threats made in *Kelly* or *Gomez*. Similarly, his threat to prevent Pérez Marín from seeing C.X.R.P. during her court-approved time, while troubling, does not generate cause for concern as to C.X.R.P.'s safety and well-being. And whereas *Kelly* and *Gomez* relied on extensive evidence of violent behavior, Pérez Marín has supplied evidence of only one potentially dangerous incident in which Rivera Jurado wielded a knife towards her in C.X.R.P.'s presence. That is not enough to establish by clear and convincing evidence that there is a grave risk of harm to C.X.R.P. if she were returned. *See Ermini*, 758 F.3d at 165. Moreover, Pérez Marín has not expressed a desire to return to Mexico or otherwise reunite with Rivera Jurado. "[G]iven the parties will not be living together, there is no risk of [intimate partner] abuse or resulting harm to [C.X.R.P.]" if she returns to Mexico. *Asumadu v. Baffoe*, 765 F. App'x 200, 201 (9th Cir. 2019).

As a final note, the protective order against Rivera Jurado does not lend meaningful support to Pérez Marín's case either. That order expressly disclaimed any custody determination, was based largely on the same allegations Pérez Marín's raises here, and was notably issued without notice to Rivera Jurado or an opportunity for him to be heard. (Doc. 13 at 10–13.) Given the strictures of the grave-risk exception, the court cannot conclude that Rivera Jurado's conduct against Pérez Marín is sufficient to warrant denying his petition.

## IV. Attorneys' Fees and Costs

Rivera Jurado—represented pro bono in this matter—seeks an award of attorneys' fees and costs incurred "as a result of the wrongful retention" of C.X.R.P. pursuant to 22 U.S.C. § 9007(b)(3), which provides:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

(Doc. 1 at 10). Rivera Jurado may move to recover attorneys' fees and costs in accordance with LRCiv 54.2. *Cf. Cuellar v. Joyce*, 603 F.3d 1142, 1143 (9th Cir. 2010) (pro bono service "does not make a fee award inappropriate" because denying fees to clients represented by pro bono counsel "would encourage abducting parents to engage in improper delaying tactics" and "undermine the Convention's policy of effective and speedy return of abducted children"). If Pérez Marín wishes to challenge the motion, she may do so by filing a response consistent with LRCiv 54.2.

## V. Conclusion

The court is sympathetic to Pérez Marín's desire for C.X.R.P. to "grow up in a safe and stable environment, free from violence, intimidation, and unnecessary emotional harm." (Doc. 27 at 3.) But it is not for this court to decide whether Rivera Jurado is a good father or even whether C.X.R.P. would fare better living with Pérez Marín. The inquiry at this stage is only whether Pérez Marín wrongfully retained C.X.R.P. within the meaning of the Hague Convention, and if so, whether Rivera Jurado's petition should nevertheless be denied. On the facts here, Rivera Jurado has met his burden of showing wrongful retention and Pérez Marín has not met her burden of showing an exception applies. If Pérez Marín wishes to contest Rivera Jurado's fitness as a parent or the parties' custody arrangement more broadly, Mexico is the proper forum in which do so.

Accordingly,

**IT IS ORDERED** the Petition for Return of Child Under the Hague Convention (Doc. 1) is **GRANTED**. The Clerk of Court shall enter judgment in favor of petitioner and close this case.

/

**IT IS FURTHER ORDERED** respondent shall return C.X.R.P. to petitioner's care in Juárez, Mexico within thirty days of this order. Per 22 U.S.C. § 9007(b)(3), respondent shall be responsible for transportation costs.

**IT IS FURTHER ORDERED** the parties shall confer regarding the appropriate amount of attorneys' fees and costs to be awarded based on the terms of this order and in accordance with LRCiv 54.2(d)(1). Within fourteen days of the entry of judgment in this case, petitioner may file a motion for attorneys' fees and costs consistent with the requirements of LRCiv 54.2. Any response by respondent as to why an award would be inappropriate shall be due no later than fourteen days thereafter.

Dated this 13th day of November, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**